UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA


IN RE:

**LAUREN L. MITCHELL**                                        CASE NO. **08-10603**

DEBTOR                                                        CHAPTER 7

**FELDER FITZMORRIS**
PLAINTIFF

V.                                                           ADV. NO. **09-1017**

**LAUREN L. MITCHELL**
DEFENDANT

**MEMORANDUM OPINION**

Plaintiff Felder Fitzmorris sued for a determination that debtor Lauren Mitchell's

obligation to him was not dischargeable under 11 U.S.C. §523(a)(2)(A)[1]. The sparse evidentiary

record[2] established that the debtor's obligation to Fitzmorris is dischargeable.

FACTS

Felder Fitzmorris's alligator business was successful enough to afford him extra income

to invest. Lauren Mitchell at the same time sought investors for her enterprise of buying and

---

[1] Fitzmorris's amended complaint alleged only that Mitchell's debt to him is nondischargeable under 11 U.S.C. §523(a)(2). Fitzmorris did not offer any evidence that Mitchell used a false financial statement in their dealings, and so section 523(a)(2)(B) is inapplicable. Fitzmorris's complaint and the evidence together establish that Fitzmorris seeks relief only under Bankruptcy Code section 523(a)(2)(A).

[2] Ms. Mitchell, who represented herself at trial, sought to call Roger Fayard in her case in chief. Transcript of January 4, 2011 trial, pp. 40 - 44. Because she did not comply with the court's October 25, 2010 scheduling order [P-64] and Fed. R. Bankr. P. 7026, the court did not permit her to call any other witnesses, although it allowed her to testify in her case in chief. For the same reason it did not allow Mitchell to offer any documentary evidence she had not produced to plaintiff before trial.

renovating houses for resale.  Roger Fayard, a "mutual acquaintance,"[3] put the two together and

thus initiated the relationship that culminated in this lawsuit.[4]

Mitchell insisted that her business was legitimate, and that it helped people "who couldn't

afford properties to buy affordable properties through investors."[5]  She explained that the

business acquired properties at sheriff's sales or on the open market, repaired them, then sold the

houses and divided profits on the sales with the investors who contributed to the renovation

costs.

Fitzmorris at first made two small loans to Mitchell that she repaid on time and with

substantial profits.  For example, Mitchell paid Fitzmorris $13,000 on a $10,000 loan early in

their relationship.[6]  Success whetted the plaintiff's appetite: Fitzmorris admitted at trial that he

was so comfortable with his relationship with Mitchell that after the first two transactions he

usually reinvested his earnings on the investments.[7]  Mitchell herself characterized the plaintiff

as a "long-term investor."[8]

---

[3]  Amended Complaint ¶6 [P-26].  Though the amended complaint described Fayard as a mutual acquaintance,
Mitchell actually employed him to identify potential investors for her projects.  Trial transcript, p. 8, ll. 2-13.

[4]  Fitzmorris testified that he had never actually met Mitchell before the trial; they communicated by telephone
alone.  Trial transcript, p. 6, ll. 18-25.

[5]  Trial transcript, p. 47, ll. 20-23.

[6]  Trial transcript, p. 8, ll. 15-25; p. 9, ll. 1-6.

[7]  Trial transcript, p. 22, ll. 8-16; p. 31, ll. 9-25; p. 32, ll. 1-17.

[8]  Trial transcript, p. 61, l. 10.  The evidence concerning the time over which the parties dealt with each other was
not especially clear.  For example, Mitchell testified that Fitzmorris had been doing business with her since around
2003.  Trial transcript, p. 58, ll. 9-25; p. 59, ll. 1-6.  She also testified that by December 2008 Fitzmorris had done
business with her and her company, Residential Consulting Associates, Inc. ("RCA1") for several years.  Trial
transcript, p. 60, l. 25; p. 61, ll. 1-10.  Mitchell's lack of attention to corporate formalities further confused the
picture: she did business under her own name as a sole proprietor; at another time through a joint venture; and at
another through RCA1, a corporation of which she was president.

Fitzmorris eventually put much more money in Mitchell's hands.  In September 2007 he made Mitchell the first loan on which this lawsuit is based, for $108,000[9] repayable in five months.  The September 18, 2007 note provided for interest of 35% (though it did not specify whether that was on an annual or other basis).  On December 20, 2007 the plaintiff loaned $226,100[10] to Mitchell and Parry Donaldson, who according to Mitchell's schedules was her "partner … in a joint venture to rehab and sell properties."[11]  It was repayable in 120 calendar days with interest of "5% of profit," and included a penalty if "any funds are paid prior to grace expiration date," a term the note does not define.[12]

Fitzmorris understood from Fayard and Mitchell that the defendant would use his money to buy and remodel houses for resale.  He testified that he would not have loaned money to Mitchell for any reason other than the home renovation projects.[13]

Despite Fitzmorris's satisfaction for much of the time he did business with Mitchell and her affiliates, eventually Mitchell failed to repay loans on time which led the concerned plaintiff to telephone her.  During the call Mitchell explained to Fitzmorris that the money he had loaned was in fact invested in unspecified real estate projects in East Baton Rouge Parish.  On examination by the court, Mitchell insisted that she'd spent all the money the plaintiff had loaned her acquiring or improving real estate.

---

[9]   September 18, 2007 promissory note (Exhibit P-4).  The note states in one place that the amount borrowed was $80,000, but elsewhere recites that Mitchell borrowed $108,000.  In any event,  Fitzmorris testified at trial that he loaned Mitchell only $80,000.  Trial transcript, p. 13, ll. 1-2.

[10]   December 20, 2007 promissory note (Exhibit P-3).

[11]   Schedule B, question 14 (Exhibit P-1).

[12]   Exhibit P-3.  Defining *interest* in the promissory note as a share of profits is unusual and, had the distinction between interest and profit sharing been relevant to the court's ruling, it would merit more discussion.

[13]   Trial transcript, p. 9, ll. 21-25.

The only correspondence Fitzmorris received concerning the parties' dealings was on RCA1 stationery and arrived several months after Fitzmorris made his last loan.[14]  That April 2008 letter, addressed to "RCA1 Partners," reflected that the decline of the subprime mortgage market led to a delay in re-selling some of the renovated properties but assured the recipients that the delay would not result in the loss of their money.  It also assured investors that their funds were "in real estate projects safer investments than stocks or banks."[15]  According to Mitchell, when the economy faltered "we were basically slow at paying people, but we were still paying them back."[16]

The Louisiana Attorney General shut down RCA1 in December 2008.  Neither party offered detailed evidence of the attorney general's investigation: indeed, the seizure was mentioned in testimony without explanation until the court questioned Mitchell about it after she rested her case in chief.  In response to the court's questions, Mitchell explained that the Louisiana Attorney General issued a cease and desist order that stopped RCA1's business activities.  In fact, the Louisiana Attorney General obtained a December 18, 2008 stipulated judgment against Mitchell, RCA1, Donaldson and Guaranteed Housing Consultants. Inc.[17] barring them from violating the Louisiana Unfair Trade Practices and Consumer Protection

---

[14]   April 17, 2008 correspondence from Lauren Mitchell, president – RCA1, Inc. (Exhibit P-5).

[15]   Exhibit P-5, ¶4.

[16]   Trial transcript, p. 47, ll. 23-25.

[17]   December 18, 2008 Stipulated Judgment and Assurance of Voluntary Compliance in *Ex rel. James D. Caldwell Attorney General v. Lauren Mitchell et al.*, No. 56-7141, Div. 22, Nineteenth Judicial District Court, State of Louisiana. (Exhibit P-6).  There was no evidence regarding the relationship, if any, between Guaranteed Housing Consultants and Mitchell.  The stipulated judgment also appears to have been intended to require the defendants to pay all outstanding promissory notes, according to the transcript of the hearing preceding its issuance, which is included in Exhibit P-6.  However, the judgment lacks a specific command to pay those obligations.  Mitchell further stated during colloquy at trial that the attorney general seized her business records, though she did not specify the date on which they were taken.

Law[18] and the Louisiana Securities Act.[19]  The stipulated judgment put an end to Mitchell's

business enterprises and as a result she did not repay creditors despite the apparent agreement to

do so in the stipulated judgment.

Fitzmorris became seriously dissatisfied with Mitchell only after the Louisiana Attorney

General's seized her business;[20] no evidence established that he took any steps to collect on his

debt before then.  He testified that Mitchell has not paid any principal or interest on the notes but

did not offer any evidence of the amount of interest he claimed Mitchell owed him as of the trial.

He also claimed to have paid lawyers about $15,000 to try to collect from Mitchell.[21]

Mitchell at trial denied signing the promissory notes and insisted that she owed

Fitzmorris less than $334,100.  She explained that she was unable to prove what she actually

owed Fitzmorris because the Louisiana Attorney General had seized her business records.

However, the schedules she signed under penalty of perjury—a judicial admission – reflect that

she does not dispute owing Fitzmorris $334,100.

## ANALYSIS

Although Fitzmorris established that Mitchell is in his debt, establishing his right to have

the debt declared nondischargeable required more than just proof of the debt.  Bankruptcy Code

section 523(a)(2)(A) only bars discharge of debts obtained by "false pretenses, a false

representation, or actual fraud …."  To succeed under 11 U.S.C. §523(a)(2)(A), Fitzmorris as the

objecting party had the burden of proving that: (1) Mitchell made representations; (2) at the time

they were made Mitchell knew they were false; (3) Mitchell made the representations with the

---

[18]   La. R.S. 51:1401 et seq.

[19]   La. R.S. 51:701 et seq.

[20]   Trial transcript, p. 23, ll. 13-16.

[21]   Trial transcript, p. 10, ll. 17-21.

intention and purpose to deceive Fitzmorris; (4) Fitzmorris relied on the representations; and (5)

Fitzmorris sustained losses as a proximate result of Mitchell's representations. *RecoverEdge L.P.*

*v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995); *In re Bercier*, 934 F.2d 689, 692 (5th Cir.

1991).

Fitzmorris contends that Mitchell defrauded him. He argues that he would not have

loaned her any money had she not misrepresented to him that that the money he loaned would be

used to buy real estate for redevelopment, development and resale. However, the plaintiff

offered no proof that the defendant misrepresented anything to him in connection with the loans.

In fact, Fitzmorris admitted that Roger Fayard, the parties' mutual acquaintance, confirmed to

Fitzmorris the legitimacy of Mitchell's business. The only written evidence regarding the parties'

dealings, aside from the promissory notes, is the April 2008 letter from RCA1 to its investors

explaining the delay in reselling some of the renovated properties. That correspondence was sent

several months *after* Fitzmorris made his last loan to Mitchell and so was not a misrepresentation

that induced him to give money to Mitchell. No evidence supported a finding that Mitchell

misrepresented anything to Fitzmorris before he loaned her any money.

Fitzmorris also claims that no evidence established Mitchell used any of the money

Fitzmorris loaned her to acquire or renovate real estate. However, the only evidence on the issue

came from Mitchell, whose uncontroverted testimony was that the money indeed was used to

renovate houses so that they could be sold. Fitzmorris, who bore the burden of proof, offered no

evidence establishing that Mitchell *did not* use the money for those purposes or that she

borrowed money from him with the intent not to use the funds as he had understood they were to

be used.

6

The plaintiff also argued that the debtor's schedules reflect her ownership of property worth about the same as the mortgage debt that property secures.  He invited the inference that Mitchell bought the properties she renovated using funds borrowed from financial institutions, not her individual investors – and based on that a further inference that Mitchell diverted the plaintiffs' funds for another, unexplained purpose.  However, Mitchell testified that she herself owns the property listed on schedule A and that the property appearing on the schedule is not the same property as that in which she'd invested plaintiffs' and others' money.[22]

Fitzmorris suggests a leap of logic that the evidence does not support.  A trial judge "[a]s a factfinder ... is authorized to draw reasonable inferences ....  An inference however, must be supported by evidence of sufficient probative value to form a rational basis for the court's conclusion; it must be drawn by reason from the facts on which it purports to rest.  An inference is not a surmise or conjecture." *Dreijer v. Girod Motor Company,* 294 F.2d 549, 554 (5th Cir. 1961).  The plaintiff offered no evidence linking the properties listed on Mitchell's schedules with the properties involved in the renovation projects or contradicting Mitchell's testimony that she herself owned the properties identified on her schedule A.  Thus the record lacks sufficient evidence from which the court may reasonably draw the inference the plaintiff invites.

Fitzmorris had the burden of proving that Mitchell obtained money from him without intending to use it for the renovation projects.  He failed to carry that burden or even to prove that she actually did not use the money for that purpose.  The evidence established that the plaintiff was comfortable investing and re-investing with Mitchell until his repayments ceased. Mitchell's failure to repay Fitzmorris alone does not render her debt to him nondischargeable under 11 U.S.C. §523(a)(2)(A).

---

[22]  Trial transcript, p. 55, ll. 14-25; p. 56, ll.1-10.

7

CONCLUSION

Felder Fitzmorris did not prove that debtor Lauren Mitchell's debt to him is

nondischargeable under 11 U.S.C. §523(a)(2)(A).  The court will dismiss the amended

complaint.

Baton Rouge, Louisiana, September 12, 2011.

**s/Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE